Ladies and gentlemen, we are here for the case of Kubsch v. Neal, 14-1898. Mr. Friedman. Chief Judge, may it please the Court. A defendant is not entitled to an error-free trial. And, of course, the state can convict somebody solely on circumstantial evidence. But if the state is to convict somebody of a serious felony, much less a death penalty case, the scales of justice shift closer to an error-free trial than rather one riddled with one. This case is riddled with errors because, at the minimum, the failure of the trial court to admit Amanda Buck's videotaped statement and the trial court's inappropriate colloquy concerning the defendant's waiver of counsel in the penalty phase. This video statement of Amanda Buck is a critical piece of evidence. So ordinarily, though, Mr. Friedman, a statement like that could be used at best for refreshment of recollection. It wouldn't come in as a substantive piece of evidence on its own in any ordinary situation, would it? I think under Chambers, I believe it should. But only under Chambers, not under the ordinary rules of evidence, would it? I'm not so sure about past recollection recorded. I'm not so sure that that's a document. I think it would come out as substantive. But I'm trying to find where, at any point, does Amanda Buck say, this is a truthful statement in any form, like an oath? I think that's where the principles of Chambers and all the cases that flow under it come into play and what makes this actually an interesting issue. We know what she said. There's a videotape. So just to tie off one other thing before we get into Chambers and what she said, I understand that it's not contested that she is, in fact, the child on the videotape. That's correct. It's authentic tape. So we know that the tape is authenticated. So even if you had shown her the tape and said, is that you back when you were nine, she would have said yes. That's right. So that much at least. It raises an interesting question. The police take this statement four days after the crimes were committed. And it's quite a detailed statement. And her mother is also present at the statement. So it's actually an interview both of Amanda and the mother, isn't it? Because the mother is providing the time frame work. Well, she's just at the end of it. I don't know whether the court had an opportunity. She's kind of in the middle of it, too. You see her hair, you know, here and there, and she reaches over. But, I mean, the key point is that she does speak at the end and verifies what Amanda is saying is true. And she remembers only that Aaron was in the yard. She didn't remember seeing Rick. My recollection is, yes, that's what it is. And she sees it during that time frame. And then also talks specifically, yes, this was the Friday and I went to the bank. Was Amanda's mother, Monica, was she questioned about having seen Aaron in the yard and so forth? At trial, I'm talking about. No, no. All that happened at trial was some more hearsay statements by the police saying, we contacted her. First, I think it was Officer Raley said we contacted her, I think, three days later. And then ultimately said, are you sure about the day? And then it first went through. It actually had a series of telephone tags. They didn't get a hold of her. They got a hold of her, Monica's father. And the father says, I'll get back to you. This is Lonnie, right? Lonnie. And I'll get back to you. And then he calls back and says, yes, they were mistaken about the day. And then ultimately. But when Monica is examined at trial. No, she's not examined at trial. She doesn't even testify. No, no. But she could have been called and impeached with the content of that interview. I believe she would have. And I guess that could be with a layer of ineffectiveness. But our initial prong, initial attack here is that the statement simply should have gotten into the chambers in those cases. In the form of the videotape. In the form of the videotape. As substantive evidence. As substantive evidence. Would the law of any state allow that? The law of evidence. You know, that's an interesting question. Because I don't think they would. At one point, Indiana law did allow statements like that under what, the Patterson case? Wasn't it called the Patterson case where you would, as long as the witness was there for cross-examination, you could introduce a prior statement? I'm uncertain. Perhaps you're correct. Law, I think that was back when I studied for the bar. It was abandoned. But I think what's interesting here is that there's serious policy considerations. I mean, the court would be more skeptical about a written statement that somebody takes down and somebody says, and then the witness says, I don't recall it, and I really don't know if I made that statement, even though I signed it. But the special policy consideration here is that it's a videotape. Let me suggest, maybe in line with the comments of my two experts in Indiana law with whom I share this panel, that maybe we could at least discuss this for a few minutes on the assumption that the ordinary evidence rules that apply in Indiana courts would not have let this come in for the substance, but that Chambers overrides the operation in certain circumstances of these ordinary rules. And maybe let you talk for a few minutes about Chambers. I think you're correct. I think that the most successful way for the defendant to get the document is under the principles of Chambers. And I think when the rules were written, and we have people who are more familiar with the Indiana law, is that they were viewing statements that weren't videotapes. I mean, I think it's special that it's a videotape, because there's no dispute that the statement was made. I mean, even with other statements that are written, and the witness says, I don't remember it, there's still that murky part of it that maybe I didn't make that statement exactly the same way. That's an interesting observation, because obviously we have the technology with the better record. The same thing would apply, though, to say a videotape of somebody's direct examination without an opportunity for cross with me. No, no. But the state also has an opportunity once the video is in to explain it away. Well, see, that's what I wonder. You know, if the video had come in, then the state, of course, was prepared to introduce the testimony of both Lonnie and Monica that this was simply a misremembered date, that it was Thursday. And I imagine there might have been a response that, no, you know, Monica, you get paid on Fridays, and you deposited your check on Friday, and here's a bank record. I mean, all sorts of things that never happened, because the tape never came in. But it seems to me, and of course, Amanda was there and available, had there been, now that you've seen the tape, has your memory been refreshed or something. There's a lot that could have happened. Right, that's correct. And, I mean, without repeating myself, the significance of the tape is the tape is pretty detailed. The tape is pretty consistent with the facts of the case. Well, yeah, but the problem I've got, or a problem I have with it, is at no point do I see Amanda being questioned about the seriousness of the subject that she's talking about or that she's providing the truth to this police officer or something like that. I don't see that as you would get if she were testifying. I think the lawyers felt they were cut off once they said, I mean, I don't recall. And she didn't even, she wasn't even asked. I think you're talking about during the interview, the video interview. During the interview, during the video interview, nor was she asked at trial whether she spoke truthfully when she talked to the officers back in, well, seven years prior. I think there should be assumption that when she spoke to the officer on the 22nd that the nine-year-old child was telling the truth and that the mother was telling the truth. Well, the mother's there, and the child certainly indicates at one point during the tape that she's aware of the tragedy that had befallen Aaron, his father, and he didn't show up for the field trip and this and that. There's no statement that I heard along the lines of what Judge Tinder's talking about of the police officer prefacing his remarks of this is a murder investigation, it's important that you tell the truth or any words to that effect. But her mother is sitting there. Her mother intervenes a couple of times. Right. And I think, you know, should the lawyer push it further, we did raise it under the prong of ineffectiveness, but I think they felt they were cut off. There's no lawyer in the room. No, I'm talking about why the video statement, all this stuff could come out at the hearing. I think the significance of the tape. Was it ineffective of counsel not to utilize it for refreshment, not to take Amanda outside the courtroom and play it for her? Is that what you're arguing? And also bringing out, yes, and also bringing out the fact. Wait, hang on a second. I thought the trial transcript indicates that they did show it to her. But it was off the record. I think it was off the record. I don't think so, but we'll have to look at it. I was a little unclear about that, actually. I mean, because the state argues that the opportunity was afforded. It's 3122. Mr. During, who's the prosecutor judge, I'm not sure. Just to make the record clear, and I hope I'm not being redundant, Mandy Buck was present and permitted to review the entire videotaped statement that represents Defendant G. McCourt. Well, that's correct, Mr. Skidinski, isn't it? That Mandy Buck reviewed the tape today, right? Mr. Skidinski, yes. Yeah. Okay. So. I think that happened off the record, yes. Oh, it did. Yeah, yeah, yeah. But there was an opportunity, and either defense counsel weren't happy with the result or there was no refreshment that happened, right? Because Mandy's position at the trial was not only did she not remember anything pertinent about the tape, she didn't even remember being interviewed by the police. Right. Mr. Friedman, I understand, I think, your argument from the principles of Chambers. Yeah. Obviously, we're under the more stringent standard here of the Anti-Terrorism and Effective Death Penalty Act. Yeah. And it seems to me that, I guess I'm concerned, that Chambers is not that hard to distinguish here, because Justice Powell's opinion for the court goes through all the corroborating circumstances. He's dealing with a well-recognized exception to hearsay, namely statements against penal interest. And he was available in the courtroom to be examined, that is to declare at McDonald. The detailed account of the reasons the court is allowing, saying that testimony was required to be allowed, seemed to distinguish this case from that. I actually think it's actually, another view is that it's stronger. One, as I said, is the videotape. It's pretty detailed. And the prosecutor had an opportunity to confront it, which they already convinced the trial court, and ultimately the Indiana Supreme Court, to exclude it based on hearsay statements of moniker, Officer Riley. Is there any reason other than the fact that both the grandfather and the mother were prepared to say it was the wrong day, that the Indiana courts thought it was unreliable? That sounded to me like their primary, maybe their only reason for saying it was okay to keep it out. My client's not a sympathetic character. People suspect, and he ultimately was convicted of the crime, that he was guilty. And there's even one statement. It's post-conviction Exhibit 3. Amanda's saying, well, Mr. Cooch didn't like Aaron. And I think they were really changing this testimony because they were not sympathetic to the defendant. And that's a risk of not letting a videotape statement in. It makes it too easy for somebody, after looking at a videotape statement, saying, Jesus, I don't remember. No, but your position can be only that under Chambers, this at least had to come in for the jury's consideration. The jury may have been persuaded by the mother and the grandfather, or they may have thought this is just unreliable in other ways, but that, you would have to argue, goes to the weight, not the admissibility. Right. And I think one of the factors you look at is what effect it had on the trial and the fact that this was a very close trial because it was circumstantial evidence, and this evidence would have actually negated the crimes itself. So I take it that much is agreed as well, that if two of the victims were seen at their own home at approximately 3.30 in the afternoon, it is impossible that it was Mr. Cooch who committed the crime. Right. That much is conceded on all sides? Right, yes. But I also think that it is important to note that even the prosecution saying that basically this crime for Rick and Aaron happened within five minutes, you know, he stabbed both of them, he shot both of them, you know, there was blood, he washed, he cleaned up and got out of there. I'm not saying that State can't present that case and that can't get a conviction, but it's not a strong case. And then when you add that mix, when you add the mix of this videotape, it makes the whole scenario fall apart. The State courts assessed it as a strong case, though. Am I misreading? They stated it as a circumstantial case. I mean, I don't think that, I mean, that's what I conceded from the very beginning. Yes, you can prove by circumstantial evidence, but the fact is it really certainly... Don't we have to give a deferential view toward how the State courts evaluated the strength of that evidence? Not when you look at the evidence that's excluded. When you look at the whole basis of all the evidence, the whole mix of the evidence, you have to find that it was an unfair trial without the amend above. I mean, a lot of this testimony... Well, wait a minute. I mean, I'm going to say, if there were no Amanda Buck tape, you look at the evidence, the State reviews it a couple of times in their brief, of the life insurance policy, and you look at the evidence of the timing of when he was there and the kind of case in the house. They review a number of things. These comments that he makes that a jury could credit that reveal information only the murderer would have, like the Beth is gone remark and the indicator that the other two were shot before the autopsy. You know it all. And so if you didn't have the Amanda Buck business there, then it seems to me the State courts are not... It's certainly enough to convict whether you want to call it A plus or C. I don't know that that... Well, some of these witnesses were murky. I mean, Penn Norman was not a believable witness. The State clearly... Nobody's counting on her testimony. But it got admitted, and I'm not saying... Mr. Friedman, if I could ask you, as I see the central issue on the Buck statement is, in essence, how is this an unreasonable application of changes? And could you address, for example, the Supreme Court's comment on its own case in Montana against Eggelhoff calling Chambers simply an exercise in highly case-specific error correction? And why can't a State court look at that and say Chambers was unusual? And say that Chambers was an unusual case but doesn't stand for this broader proposition that says, in essence, we're going to forget about hearsay rules when the defense is offering the evidence. At some point I agree with Montana. They have a valid reason for the rule. But here the valid reason is to keep out the videotape, and you also have to look at the full record at home. But you have to say why the Indiana Supreme Court couldn't look at Chambers in light of Montana and come to the conclusion that the bar for finding a Chambers violation is higher than what was presented in this case. And you have to explain why this is an unreasonable application. Because the case was closed. You listed a lot of the witnesses. I mean, the basic theory of the case, he killed them to get out of credit card debt and get out when he could have sold the property. He kills the wife and then the other two come in. Come in. And the killing of the two is very weak within the time frame with that. And the type of evidence, we've already talked about Norman's testimony, but then you had the testimony from Nichols, which is really questionable too. He's confused. I mean, all the evidence is murky, and then the actual piece of evidence that can explain in a way the defense when you balance the type of flexibility that the state had, the defendant should have had that statement in under Chambers. Flexibility the state should have had? Well, they brought in witnesses that were not very believable. They had a right to present them, though. Along those lines, can we agree that if the state had tried to present a statement, a videotaped statement from a 9-year-old implicating Mr. Koopsch and it was detailed and so on, that that would be a clear violation of the Sixth Amendment? I think it would have been admissible. I think it would have been admissible under United States v. Owen. They would have gotten it in. Seriously? Yes. I would not believe that they would have kept it. In 2005? Yes, they would have gotten it in. After Crawford? What? Maybe not under Crawford. But the point is, under the principles of the rules of evidence, they would have gotten it in. And I think that's the problem. I mean, this is a type of circumstantial evidence case. The only basic way to ultimately give Mr. Koopsch a fair trial is to let the evidence in and determine whether they really did prove their circumstantial evidence case. And the strongest U.S. Supreme Court authority requiring that result is? I would look at the three cases. It would be Chambers, Crane, and the Holmes v. South Carolina. I think those scenarios are the most sympathetic to Mr. Koopsch. And when you look at the Montana case, look at the reason you can exclude that evidence if the rule is rational. And I believe not excluding an actual videotape. So let's understand what rule it is you're advocating, okay? Is it because it's a videotape? Is it because of her age? Is it because of the level of detail? I mean, how would we rule in your favor? I would rule on the level of detail, which is consistent with the other facts in the case, and then ultimately it is a videotape, and then when they came in with another scenario in March of 2000, the whole scenario changed. So are you relying at all on the fact that we have, on the one hand, a stipulation that it is Amanda on the videotape, but on the other hand that Amanda at the trial renders herself functionally unavailable? No recollection of anything whatsoever. I mean, unavailability begins to sound to me more like something the rules of evidence understand. I'm uncertain on that, but I know that the whole purpose of using videotape in this day and age is to avoid this type of problem. Right, and we have the hearsay rule, you know, and so we don't normally just pop videotapes in unless there's a recognized... Right, and there was an opportunity for the state to confront that statement and have the jury discern the credibility of it all. Well, and the state, I suppose, could confront it through the mother and through, you know, even Amanda herself. Maybe you should talk a little bit about your Faretta report. Just very few points in the few minutes before the rebuttal. It's clear that a defendant has a right to forego counsel and defend themselves even in a death penalty hearing as long as the judicial inquiry ensures that there's a knowing, intelligent waiver. The spirit of Faretta was violated here because he didn't so much point out the dangers and disadvantage of the self-representation, but to discourage such representation. Here, he actually encouraged it. He actually said to the defendant, whether he's incompetent or otherwise, he had mental problems, he said, well, the penalty phase won't be as complicated as if it was the whole trial. So could I ask you, I mean, I assume that Mr. Koops at this point wants you to be contesting his conviction and his sentence. That's correct. So there comes some time after the penalty phase and the present day where he changes his mind. That's great. I think that this case is kind of unique and it's something, I have to be honest, it's not mentioned in the briefs. He wanted to waive his mitigation at the first trial. And there was this colloquy where the judge talked him out of it. And that is, and I'll give you, that's in the first trial, it's TR 5362-81. And there you see what an appropriate colloquy he is. He said, do you really want to do this? Even if you're going to be sentenced to death, this is not good for you. It's not good for your family. You really want to not do this. This is not good. I have to discourage you. And then said, I even beg you not to do it. And then Koops says, okay. I mean, he could have been talked down. And he regretted it later, right? Because, let me, is it correct that the judge in the trial court in the post-conviction proceeding Yeah. If I understood her opinion correctly, Koops was still telling her he stood by his decision to waive counsel. I mean. Is that right? Yes, but he was unstable. And he can be talked out of it. He was talked out of in post-conviction. He let himself be examined by other experts. He didn't really want to do that. Well, I need to go on this issue. I need to ask you essentially a parallel question. Okay. About why we can argue whether this was a, whether the judge should have tried to do more to discourage this. But we've got the Supreme Court in Iowa against Tovar saying, there's no script that's required here. And in fact, the information that you need to provide is going to depend on a whole lot of case specific considerations, including the stage of the proceeding where all that's going to happen in this case is simply talking directly to the jury, like an allocution. So under those circumstances that the Indiana Supreme Court reviewed in considerable detail, how is this an unreasonable application of a U.S. Supreme Court case? Because the spirit of Ferretta, the actual principle is to discourage. The spirit of Ferretta is to respect the autonomy of even a foolish defendant. That's correct. But also to try to discourage him from doing that. And that's not what happened here. And that's the distinction I'm making today. So you find an affirmative duty to discourage? Yes. Where do we find that? In Ferretta, yes. And that was not done. So you're saying that the trial court, the state trial judge committed legal error by saying, well, for you, this isn't a big deal because all you're going to do is tell the jury to do whatever it wants? Yes, yes. I mean, even look at this court's opinion in Kidd. You could see that Kidd wanted to waive. He couldn't be discouraged. But it's clear on the record that he was trying to discourage him. And just by coincidence, I mean, it's in the record, it happened once before and was discouraged. If there's anything else. You can save your time for rebuttal if you'd like. Okay. Mr. Martin. Thank you, Your Honor. Please, the court. This court should affirm the denial of federal habeas relief. The issue that's been raised by the petitioner here with respect to the exclusion of hearsay has to do with what is, at bottom, not a very remarkable and appropriate evidentiary ruling at trial. It seems that the petitioner's position here is that there's always some kind of a tension between the application of evidentiary rules and what the federal constitution requires. Well, there is some tension. You know, the Supreme Court has talked about it. The hearsay rules keep out evidence that people rely on in their day-to-day life. And I'll say the thing that's very troublesome about this case is that given other things that everybody seems to agree about, which include that if the victims were seen at their own home at 3.30 in the morning, they would be seen as poops. So if that were contested, that would be a whole different case, in my view. And this strange amnesia that Mandy Buck suffers from at the second trial, which I consider very strange since, you know, for a nine-year-old to have to go to the police station and talk to the police. I watched the whole video. You know, she's a smart young girl and quite observant and gives a lot of details. And this actually gets to, you know, to the worst kind of death penalty appeal, whereas if what she says in that video is true, he didn't kill them. And yet you're going to execute him. And that seems very troublesome to me. Well, Your Honor, and not to make an overly obvious point, but hearsay is in itself unreliable. We say that in the common law, but it actually isn't. You know, sometimes it is more reliable than other times. That's why, for example, the hearsay rules themselves have an exception for a whole host of categories, including some categories where, you know, like if Mandy had been hit by a car and killed, maybe we would have let this videotape in because she would have been unavailable if she'd been dead herself. There are, I don't know, there are all kinds of things. And again, I'm alluding to some comments that Your Honor made a moment ago. The rule in Chambers, as it was applied in Chambers, was pretty fact specific. And Chambers did have numerous sort of cross-referencing indicia of reliability with regard to the hearsay that was at issue. And it involved statements against penal interest. And the point I was simply trying to make, Your Honor, with respect to the rules and constitutional requirements, is that the recorded recollection rule requires that reliability be shown. And at a bare minimum, you ask the declarant if that was a truthful representation, the hearsay. Is the Indiana rule different from 803 on that point? It's 803-5, Your Honor. Right. 803-5 doesn't say you have to ask the witness. It just says a record that's on a matter the witness once knew about but now cannot recall well enough. B, was made or adopted by the witness when the matter was fresh, okay, four days later. And C, accurately reflects the witness's knowledge. So it doesn't say you have to ask the witness about that. If it's a video, maybe it does accurately reflect the witness's knowledge. Indiana law has interpreted the accurately reflecting the witness's knowledge not as, you know, as Your Honor has pointed out. Authenticity was not an issue here. But that can often be the case with any manner of recorded hearsay statement. But if you've forgotten, how do you say, although I have forgotten that accurately reflects my knowledge? What a strange statement to make. Is that what Indiana law requires people to say? I think what it – I would liken it, Your Honor, to – Is that what Indiana law requires people to say? This court issued a decision in U.S. v. Cash, I think it was, where there was a Veterans Administration worker who had heard statements from a disgruntled veteran that he was going to come down and kill them if he didn't get his 100% benefit. And the way that got admitted as a recorded recollection was the witness said, yes, I can look at this stuff that I wrote down. It's not going to refresh my recollection. I'm not going to remember it. But I know what my methodology was, and I was careful, and if that's what I did then, that was the truthful reflection of what was given to me. That's not the same as saying that – you know, that's one step removed. And apparently nobody asks Amanda to say, if I said it then, then that's what I meant then. That's all – I mean, that's a way less difficult thing to do than say, even though I don't recall well enough to testify, I can tell you whether that's what I knew at the time. That's contradictory, and surely the law doesn't require that. Well, Your Honor, I think the record makes it very clear. And what Chambers talks about, as this court has observed in prior holdings, is that a mechanistic application of a state evidentiary rule that excludes critical hearsay wouldn't comport with the Constitution. Well, and that's what we're here talking about, whether the Indiana Supreme Court, in saying that what you just articulated is not met here, was an unreasonable application of Chambers. Everybody understands. No one thinks they didn't know Chambers was out there. Well, there was nothing mechanistic about the application of the rule in this instance. What does mechanistic mean to you? I'm sorry? What does mechanistic mean to you? I guess in the context of the holding in Chambers, it is a sort of rote, dry application that doesn't provide the defendant with any reasonable means of putting this information through reliable testimony in front of the jury. Here we have two witnesses that are present and could testify. But those two witnesses, I mean, I am so unimpressed by the state's argument that just because the mother and the grandfather said she misremembered, that seems to me absolutely to go to the weight because it's my personal view that somebody could have looked up the bank records and figured out which day Monica deposited her check. And if she deposited her check on Friday, then your whole argument falls apart. That didn't happen, you know, but whatever. I don't see why that's not a weight matter rather than an admissibility matter. Well, I mean, as Your Honor points out. It was only four days later, you know, and she was in a position to observe. She's right across the street. All of the other kinds of reliability factors are well met. Well, I mean, these are being urged as things that make the statement more reliable. You don't contest it was four days later. No, I do not contest it was four days later. I guess it's September 22nd. Right, right, Your Honor. No, what I'm saying is. And you don't contest where her house was vis-à-vis. No, no. What I am saying, Your Honor, is that the kinds of things that Amanda Buck's talking about in that videotaped statement are things that they routinely observed. This could have happened on any day of the week, on a school week. No, with a field trip the next day. She knew that there was going to be a field trip on the weekend. And Aaron was going to be in her group, and Aaron didn't show up, and it was the next day, she makes it clear. And there's evidence in the record, Your Honor, that Monica Buck also thought that she'd seen those things, as Your Honor alludes to, that she'd cashed a check that day. And she's very clear she didn't see Rick. She saw Aaron. She's asked by the officer several times. Oh, you're talking about Monica, Your Honor? Yeah, and I mean. Amanda saw both of them. Monica saw only Aaron. And I think in terms of whatever exculpatory value, if this evidence had been reliable and truthful, would have had, that distinction wouldn't have mattered. If one or either were still alive, then that still would have been an alibi. That's correct. But, Your Honor, I want to get back to the point that you just raised, which is that you were talking about actually doing a further checkup on the circumstances and presenting something more squarely to refute the. . . Because Monica's isn't either at that point. And the trial court would never have let in she deposited a check that afternoon with no foundation. Well, and, Your Honor, you alluded to the fact that none of that was done. Well, I mean, I think that speaks volumes. The trial court actually was the one that sort of urged Mr. Koops's attorneys to bring Monica and Amanda back the following day from when it was first broached in testimony and have her look at the tape. And as we know from the record, that did occur. She did look at the tape. Contrary to what impression I was getting from your brief, actually, it sounded like when you presented it that they let that pass by, but that's clearly not true. No, Your Honor. What I was trying to communicate in the brief was that the purpose of that was to then have Amanda either outside the hearing of the jury or in front of the jury give some testimony about the circumstances under which she gave that statement. They would not do that. Because she said she didn't remember it. Well, that might have been. . . That's the testimony anyway. I don't know if she remembered it or not. And Monica Buck was also available. So what we have here is a trial court being asked to offer hearsay when we have live witnesses and a refusal to try to develop any further foundation. And even at the time of post-conviction relief, no one presented any testimony. You're making a pretty good argument that they were in effect, that counsel was ineffective at the second trial by not pursuing. No, Your Honor. The point I'm trying to make is that trial counsel wasn't ineffective. Trial counsel knew what the rebuttal testimony was going to be. Well, we don't know that. You're totally speculating. I think what Judge Tinder is suggesting is equally possible. They just utterly dropped the ball on this. And surely it would have made a difference. I mean, if what she said is true, then he didn't kill these people and he's going to be executed for murders he didn't commit. If what she said was impeachable and not true or there's some other theory, then there's a lot of circumstantial evidence that he did commit the murders and the state has decreed the death penalty for him. Well, and Your Honor, I mean, and let me go to some more evidence that is in the record, in the post-conviction record. I found it a little curious when the Indiana Supreme Court made its observation about the impeachment issue because nowhere in the record at trial is there an attorney's record and due impeachment with the statement. Well, when the trial judge says, look, you want this for the truth. You don't want this just as impeachment. I think that's pretty clear. And then at post-conviction, when his attorneys give their testimony about the matter, they made it emphatically clear that they never wanted her to have a word to say about the circumstances of the tape. They just wanted the tape in as substantive evidence. Well, they probably would have liked her to have testified from her recollection of the events, but when that proved not to happen, that's then they were thrown into plan B. Well, she may well have been able to testify as to the events that she talked about on the tape, but they declined to present her in that fashion. And this is a point I didn't make, Your Honor, which is, I mean, this is not the State's witness. He puts this witness on the stand for the sole purpose of trying to admit this hearsay as substantive evidence. Mr. Martin? Yes, Your Honor. Can you shed any light on an issue that was, that you all raised in your brief and opposing counsel addressed in reply? The importance, if reliable, on Anna Buck's testimony, or her statement is obviously critical. Nobody called her in the first trial. Does the record shed any light, including the record of the first trial, shed any light on that? No. There's no record development on that, Your Honor. Nobody asked in the PCR hearing? No. The only thing that we have that's relevant and somewhat enlightening from the post-conviction record is that we do know, also this is something that the Deputy Prosecutor alluded to at the time when this issue arose at trial, was that, and we know it through Sergeant Ryle's testimony at post-conviction, is that after the tape statement was made, and, well, let me finish that thought before I jump to something else. After this tape statement was made, it was in evidence, and there's no contention that the defendant didn't have access to a statement by a witness that would arguably have been an alibi. And yet there was nothing done with it. She wasn't listed as a witness. It wasn't listed as an exhibit. There was no treatment of it at all in the first trial. So what we have to assume here is that those trial lawyers, which were different than the trial lawyers that represented him at the second trial, in addition to the trial lawyers here, in addition to his post-conviction lawyers who couldn't present any evidence that would show that this was something that would have been shown to be reliable, is completely absent from the record. So that's three different stages of review where there's been no record made to show that, yes, this was a reliable statement, and the trial counsel could have shown that or had a way to show that. They didn't. But let me just point out, I mean, for something like this, in the transcript of the second trial, there's a point on cross-examination that Mr. Dering questions, as I understand it, Mandy, you did not see Aaron at all that day that you can recall. He's not talking about the tape here. He's just asking her, is that correct? Answer, I don't really recall. No. So they are actually trying, somebody is trying to get what you're calling the direct testimony. But she's just suffering from amnesia. But that was before she'd been shown the video, Your Honor. And I guess I would also say with that that I think it was during that exchange or right around that area of the interaction with the witness that she made the statement that the Indiana Supreme Court alluded to, where she said, I probably didn't see Aaron on that day. And, you know, to the extent that they could have used the tape to impeach her on that point, no attempt was made to do that. They didn't want to do that because the rebuttal testimony was still waiting in the wings if they had tried to do that. And the silence in counsel's adamant representation at post-conviction that he wanted the tape in as substantive evidence shows that he didn't want to try to build that route. Well, in the absence of her direct testimony, there's a long exchange with the trial judge about whether this is coming in as impeachment. The judge is completely unconvinced that that's the reason. He says that's not right. They wanted it as substantive evidence. Your Honor, the record is what it is. Yeah. But the fact remains, this was hearsay. Chambers, to the extent that it can be called a rule of constitutional law at all. Why would you doubt that? Well, Your Honor, and I'm not saying it's not a valid Supreme Court holding. Of course it is. I'm sorry, Your Honor. I didn't mean to suggest that it's not. I'm talking about a rule that is amenable to routine application. To the extent that it is that, a clearly established rule of federal law, it's a broader one, to say the least. And we know that the broader a rule is in its application, the more difficult it is for a federal court on review to find that a state court has unreasonably applied that rule. And I don't think we're anywhere close to it here. I just wanted to address one thing with respect to the Ferreta claim that you heard Mr. Friedman speak about. I just wanted to correct that there was an admonishment and a warning from the trial court about going forward. It's just a little bit of an admonishment. And then the problem with the Ferreta claim is really just that one statement from the trial judge who says, since you've decided to throw in the towel, it's really not going to be that hard for you. And that's, I think, the one part that seems to go against the thrust of Ferreta. I think, Your Honor, that the trial court was pretty careful in trying to spell out on the record and from Mr. Koops what could be done on his behalf if he had wanted counsel to continue in its representation. And he put that on the record, what witnesses would be offered. It was basically the same character of mitigation that was offered at his first trial. He says, can you confirm you wouldn't wish any of those witnesses to testify? Answer, that is correct. You would intend to simply present no evidence whatsoever. Is that correct? I have a brief statement. That would be pretty much it. Then they talk about evidence. And then that's when he makes the comment that your representation would not be as complicated as if you were handling the whole trial by yourself. Do you understand that? Well, and as Your Honor has discussed with Mr. Friedman, I think what Mr. Friedman stated was that the admonishment or the colloquy that occurred between the defendant and the trial court in the first trial was how it should be. I bring that up only to underscore the fact that Mr. Koops was a pretty seasoned litigant at this stage of his proceedings. There was no colorable showing of any lack of capacity. He was, in fact, as defendants go into criminal prosecution, reasonably sophisticated about what was going on legally and factually. It's your position then that a defendant, perfectly competent defendant, can kind of take the Gary Gilmore approach and say, fine, go ahead, kill me. Even though I think I'm innocent, kill me. So that means maybe the state of Indiana could just sort of pass out cyanide tablets at the end of trials and say, you know, you can just do it right now. Your Honor, I would never take that position. I don't think that that's something that our state Supreme Court would... Why not? If you can just say, you know, I want the state to kill me. Well, to the extent that the person... And Mr. Koops says, I want the state to kill me, even though I know I'm innocent. He doesn't say, I'm really sorry for what I did, and I'm ready for the state to kill me. He says, I want the state to kill me, even though I'm innocent. Your Honor, I do not read anything Mr. Koops said at trial as being an invitation for the jury to kill him. I think what he did was try to use a little rhetorical flourish and urge the jury to consider the fact that it made a mistake in finding him guilty. So he's using residual doubt to say, you made a mistake. You've wrongly determined that I killed these people. And I think he tried to appeal to them on a human level and say, my friends and family that know me know I couldn't do this. But he also says, these were terrible, terrible things that happened, and whoever did those things should be put to death. Again, I think trying to appeal to their sensibilities. But he knows they've just convicted him. I mean, what could be clearer than this group of people think he did it? Correct, Your Honor. Correct, Your Honor. My point to the court is just simply this. His best mitigation at this stage, particularly when this is a do-over, as it were, was to argue residual doubt. It wasn't a do-over for this jury. Correct. That's correct, Your Honor. At any rate, our position is that the petitioner comes nowhere close to showing an unreasonable application of clearly established federal law, and we would ask the court to affirm. Okay. Thank you very much. Thank you. Mr. Friedman. Just briefly. Mr. Friedman, can you also address this question about the absence of Amanda Buck from the first trial? I have no basis to know why they didn't do it. They should have used it. I mean, I think that was, when you look at the whole circumstantial evidence, Amanda Buck's a key piece of evidence, whether he gets it or not. I mean, it's just an important situation. It removes him from, at the minimum, at the minimum, two of the murders and makes him non-death eligible. Notwithstanding, taking the whole scenario collapses and there's reasonable doubt for the Beth murder. But I just want to bring out that the Chamber's rule is not a hearsay rule. It's about a rule where the defendant has a right to present a defense and whether the hearsay rules of the state are unreasonable. And basically, our position is, in light of the fact that it's a videotape, we sort of know it's authenticated, we know that these statements were made and that the state also has an opportunity to try to confront them with this hearsay evidence that they've self-mentioned in the record, Monica and Amanda herself. But at the end of the day, I mean, I don't think it might have, I don't think it would have held up in light of that. They're talking about this receipt going to the bank. It probably happened on a Friday. And so I urge the Court to find the statement reliable. It would set a bad policy not letting videotapes in unless there's some special reason to make the videotape unreliable or that the state had an opportunity to confront the videotape. And in light of that, we urge that this Court reverse the conviction. Unless there's any questions, I'll sit down. Apparently not. Thank you very much. And we thank you. You were appointed, were you not? Yes. Thank you for the assistance to your client and to the Court. Thanks as well, of course, to the state. We appreciate the fine arguments from both of you. We will take the case under advisement and the Court will be in recess.